## Case No. 4,693.

### The FAVORITA.

[1 Ben. 30.][1]

District Court, E. D. New York. Feb. 1866.[2]

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[2] [Reversed in Case No. 4,695.]

B. D. Silliman, for libellants.
Benedict, Burr & Benedict, for claimants.

BENEDICT, District Judge. This action is brought by the Union Ferry Co., owners of the ferry-boat Manhasset, against the steamship Favorita, to recover damages for injuries sustained by their ferry-boat in a collision with the steamship, which occurred on the afternoon of the 14th of April, 1865.

At the time of the collision the weather was clear, with a fresh breeze from the S. S. W.; and the tide was ebb. The steamship was proceeding up the East river to her berth at 12th street, New York, and the ferry-boat was on a trip from her Main St. slip on the Brooklyn side, to the Catharine St. slip on the New York side. The time of the collision was between three and four o'clock in the afternoon. The place of collision was off the Main St. slip.

The allegations of the libel filed in behalf of the ferry company are, that the ferry-boat was detached from her fastenings, and proceeded to the mouth of the slip, when the pilot and those in charge perceived the steamship proceeding up the river on a line across the front of said slip, and at about right-angles with the course of the ferry-boat, near to the Brooklyn shore, and at such a distance therefrom and from the ferry-boat, that it would not be practicable for said ferry-boat to cross the bows of the steamship, but to avoid a collision it became necessary that the ferry-boat should pass to the left of the steamship, and between her and the Brooklyn shore. That the pilot of the ferry-boat, immediately on discovering the steamship, reversed his engines, and also gave two blasts of his whistle, "to notify said steamship that said ferry-boat would so pass to the left of said steamship, and between her and the Brooklyn shore, and that said steamship should pass to the left of the Manhasset." That it thereupon became the duty of the steamship to sheer toward the New York shore; but the steamship disregarding the signal, and making no response thereto, sheered toward the Brooklyn shore, making it impossible for the ferry-boat to pass between the steamship and the Brooklyn shore; and by reason of her paying no attention to the signal, and of her being sheered toward the Brooklyn shore, she collided with the ferry-boat, striking her just forward of the port wheel.

This statement of the movements of the ferry-boat challenges attention at the outset, as involving a departure on the part of the ferry-boat from the general rule which requires that when steam vessels are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other, and the other shall keep her course. Regulations of 1864, arts. 14–18. According to this rule, it was the duty of the ferry-boat to keep her course, and the responsibility of avoiding her devolved upon the steamship. But according to the libel, the persons in charge of the ferry-boat, immediately upon discovering the steamship, assumed to determine the method by which collision was to be avoided, and stopped and backed, with the design of passing the steamship to the left, and between her and the Brooklyn shore. Under this libel, the burden must be considered to be upon the ferry-boat to justify her action, and to show that the course she so marked out for the two vessels was the proper one, and necessary to avoid immediate danger. This burden has been assumed, and in support of the averments in the libel, the persons in charge of the ferry-boat, together with pilots from other ferry-boats in the neighborhood at the time of the collision, have been produced, who concur in expressing the opinion that the action of the ferry-boat in stopping and backing was proper, and apparently necessary to avoid collision with the steamship as she was coming. It is to be noticed, however, that some of these witnesses produced by the libellants, put forth this opinion with little confidence. Thus the pilot of the ferry-boat himself says, "had we kept on, and the Favorita not changed her course, there would have been a collision the same—can't tell whether the Favorita could have sheered enough to Brooklyn to clear me—don't think she could at the speed she was going." Conklin, a passenger on the ferry-boat, and who saw the movements of both vessels, is not asked on this point; while Cole, a pilot called by the libellant, who was on a ferry-boat bound to the Fulton Ferry slip, says, "Don't hardly think the ferry-boat could have cleared her by going on."

As against these opinions, and in favor of the allegation of the answer, that the ferry-boat could have and would have passed in safety had she kept her course, the claimants produce the persons in charge of the navigation of the steamship, and also three persons who were standing on the forward part of the steamship from the time the ferry-boat appeared. These three witnesses, Mr. Erastus W. Smith, Mr. T. F. Secor, and Mr. Daniel D. Westervelt, are persons acquainted with the harbor and with the capacities of vessels. They were in no way responsible for the management of the steamship, and they were watching the movements of the two vessels with care. The statements of such witnesses upon a question like this, seem to me to be entitled to great weight. All these persons concur with the master, pilot, and mate of the steamship, in a positive opinion that it was not necessary for the ferry-boat to stop to avoid danger; but on the contrary, that the steamship could have

passed under her stern in safety had the ferry-boat kept on, and that her failure to keep on was the cause of the accident. The statement of Mr. Secor is emphatic; he says, "I say, and did say at the time, that had the ferry-boat kept on we would have gone clear under her stern—no doubt of that;" and several other of the witnesses are equally positive. The weight of opinion, therefore, of those who saw the occurrence, seems to me to be strongly against the ferry-boat upon this point.

This opinion is confirmed by facts proved in the cause relative to the manner in which the two vessels came together. The ferry-boat, as it appears, was struck not over eighty feet from the Brooklyn end of the boat, and when struck she had stopped her headway, and was moving back. How far she had backed is not clear from the evidence. The pilot estimates the distance as not over ten feet. Mr. Westervelt thinks she backed one or two lengths. Mr. Smith says more than half a length; but whether the distance she backed be ten or three hundred feet, it is manifest that the time necessarily occupied in stopping and backing and getting sternway, was sufficient to have enabled her, had she kept on, to have passed more than eighty feet further to west, and so to have been beyond the track of the steamship. This is still more manifest if the position of the steamship at the time the ferry-boat stopped is correctly given by the pilot of the ferry-boat. He places the steamship at that time off the bulkhead next above the Fulton Ferry slip, and while the steamship, endeavoring to stop as she was, would pass from this point to the place of collision off Main St. slip, the ferry-boat would certainly have passed more than eighty feet, and beyond all possibility of contact with the steamship.

From the weight of opinion of persons competent to judge, and who were present, as well as from the position of the vessels and the manner of the blow, I conclude, therefore, that if the ferry-boat had kept on her course, the steamship would have avoided her, and that she must be held guilty of fault in determining to pass to the left, and in stopping and backing when she did.

It was urged in argument on behalf of the ferry-boat, that even if the position of the two vessels was such that the steamship could have passed astern of the ferry-boat without danger had the ferry-boat kept her course, yet the ferry-boat having proposed to pass to the left by giving two whistles, and the steamship having concurred by giving no dissenting whistle, the steamship must be held exclusively responsible for the manoeuvre; but an answer to this is found in the fact clearly proved by the libellant's witnesses, that the determination of the ferry-boat to pass to the left was made and acted upon by her before she blew her whistle. She gave the steamship no oppor-

tunity before she took her course, either to assent or dissent, and her whistles, blown after she had stopped and reversed, amounted under the circumstances to a mere notification of what had been already seen by those in charge of the steamship, that she was stopping and backing. Dissent by whistles at that time would have availed nothing, for it was too late for the steamship to break her sheer and attempt to pass to the left.

The fault of the ferry-boat in stopping and backing as she did is more apparent when it is considered that she moved out of her slip at full speed, and passed a sufficient distance into the open river, before she stopped, to fairly warrant the persons on the steamship in concluding that she intended to keep her course, and that when the pilot stopped and commenced the movement of passing to the left, or perhaps more strictly prepared to commence a movement to the left,—for there is no evidence that he did more than stop and back,—the steamship had already ported her helm, and was then sheering towards Brooklyn to pass under the stern of the ferry-boat. That this is so, appears by testimony furnished by the libellant. Conklin, a passenger on the ferry-boat, states that after going out of the slip he left the main-deck and proceeded to the centre of the boat, and then passed up to the upper deck on his way to the pilot-house; that after he reached the upper deck the pilot rang his bell; that then, when he for the first time saw the steamship, she had "a pretty rank sheer in shore." Thomas, the lookout on the bow of the ferry-boat, states that he did not see the steamship, although in plain sight from the time he reached the mouth of the slip, until the stern of the ferry-boat had passed fifty feet beyond the slip, and that the ferry-boat "went out about half a minute more before the pilot rang the bell," and the steamship, he says, was then sheering in towards the Brooklyn shore. Cole, a pilot also called by the libellant, thinks the ferry-boat when struck was outside of the eddy. Of the witnesses called by the respondent, Mr. Secor is very clear upon this point. He says he saw the ferry-boat as she appeared coming out of the slip; that she continued to come out for some little space; that he stepped to larboard to satisfy himself that the engine of the steamship was working back, and saw that it was; that he then went to the bow, and when he got there the ferry-boat was still on her course, and a second or two afterwards she stopped. According to the evidence, then, I think it cannot be doubted that stopping the ferry-boat when he did was a manifest mistake on the part of the pilot of the ferry-boat. If the proximity of the steamship was such as to render it necessary to disregard the general rule which required him to keep on, the time to depart from the rule was when the steam-

ship first came in sight. Had the man, who was stationed on the bow as a lookout, reported the presence of the steamship as soon as the bow of the ferry-boat passed the mouth of the slip, and the ferry-boat been then stopped and backed, all danger would have been avoided. If the steamship was then seen, the action of the pilot in moving on his course and out into the river shows that he then determined that a departure from the rule was not necessary to avoid danger. If the steamship was not then seen by the pilot, there was great carelessness on the part of the ferry-boat in not keeping a better lookout. The tide was low, and the slips and vessels at her lower pier prevented her pilot from seeing below the slips until the boat reached nearly or quite to the end of the piers. Great caution was therefore required in passing out. The boat should have been well in hand and a careful watch kept, so that the presence of a vessel in the river below would be seen at the earliest possible moment, and then if proceeding on her course would involve danger, she should have been at once stopped and backed. Instead of pursuing this cautious course, the ferry-boat, as her own witness proves, passed out of the slip at full speed, and was fairly on her course and in the river before the lookout discovered the steamship; and then, apparently not noticing that the steamship had already taken a sheer to pass under her stern, her pilot, without warning by whistles or otherwise, stopped and reversed his engine. The safety of the persons who are compelled to cross these ferries, requires that such lack of care should be condemned.

There remains to consider whether the steamship was guilty of fault. Two faults are charged: first, that she did not stop and back in time; second, that she disregarded the law of the state which requires all vessels navigating the East river to keep in the middle of the stream. As to the first-mentioned fault, I do not think that it is made out. The evidence shows beyond controversy that the steamship stopped and reversed as soon as, if not before, the ferry-boat was seen to stop, and the requirements of article 16 of the regulations of 1864 would be fulfilled by stopping then, for not till then was there any serious danger of a collision. Indeed, the testimony of Mr. Secor before alluded to, is strong evidence that the steamship stopped before the ferry-boat did, and as soon as the ferry-boat appeared at the mouth of the slip. I have no difficulty, therefore, in holding that the Favorita was free from fault in this respect. As to the remaining fault charged, that the Favorita was being navigated too near the Brooklyn shore, there is perhaps room for doubt; but after full examination of the evidence, I am satisfied that she must be held guilty of fault in this particular. I fully agree with the counsel for the claimants, that where the steamship was, below the Fulton Ferry slip, is of no consequence, and I am moreover satisfied that owing to the fact that at the Fulton Ferry slip the river turns, and above that slip the shore bends rapidly to the eastward—even if it be conceded that the steamship when she passed the Fulton Ferry slip was within two hundred feet of it, as claimed by the libellant, and that without excuse—still she could not for that reason be considered guilty of a fault which conduced to the collision, because the course she was then on as she came up to the bend, if maintained, would carry her, when she had passed the bend, away from the Brooklyn shore and towards the middle of the river, and would have given time and space to pass on either side, and without risk of collision of a ferry-boat coming out of the Main St. slip. But a consideration of all the evidence satisfies me that the steamship, tempted, doubtless by the eddy, instead of taking a straight course from off the De Forest dock, and so bearing toward the middle of the river, as for all that appears here she could have done, followed the trend of the river after passing the Fulton Ferry slip and before she ported to avoid the ferry-boat, which, according to the testimony of her pilot, as well as that of Mr. Smith and Mr. Secor, was when she was half way between the Fulton Ferry slip and the Main St. slip. The testimony of many witnesses, some called by the libellants and others by the claimants, shows that when the ferry-boat appeared at the mouth of the slip, the steamship was much nearer to her than she could have been had she kept as far out as a straight course from the Fulton Ferry slip would have carried her. They were then so near each other that the engine of the steamship had only time to make one turn back before the blow. The estimated distance given by some of the witnesses for the libellant tends to confirm this conclusion. Thus McGinn, the pilot of the steamship, puts his vessel at three hundred feet out from the Fulton Ferry slip when he passed that point, while Mr. Secor places her when half way between the Fulton Ferry and Main St. slip at two hundred or two hundred and fifty feet off the piers. These distances, if they are to be relied on, would indicate clearly that the steamer had followed the trend of the shore. That this was so seems further to be indicated by the manner of the blow, which was nearly at right angles. If the steamship when she ported her helm to avoid the ferry-boat had been any great distance out, she would, before reaching the point where she struck the ferry-boat, have swung so far as to make the blow much more oblique than it was. This conclusion, it should be noticed, is not in conflict with any evidence given by those in charge of the steamship as to the course followed by that vessel after passing the Fulton Ferry. They give estimates of distance which would indicate no turning of

the bend, but they do not say that they kept a straight course, and give no reason for not heading towards the middle of the river after passing the Fulton Ferry slip. After seeing the ferry-boat, the steamship properly ported and then rapidly neared the Brooklyn shore; but before she saw the ferry-boat, and while passing from the Fulton Ferry to the point where she saw the ferry-boat, she must have kept along instead of away from that shore, and so found herself in close proximity to the ferry-boat when it first appeared. This proximity may well have tended to confuse the pilot of the ferry-boat and so have conduced to the error he made. It certainly gave no opportunity to make even a slight allowance for any difference of opinion as to distance, or for any error of judgment on either side. Such a sudden approach to a vessel coming out of the piers is precisely what the statute was intended to prevent. The safety of the navigation in this crowded port requires that the statute be rigidly enforced, and that every vessel which meets with a collision while navigating in violation of it, should be required to show satisfactorily that such violation was not a cause of the accident. The respondents have failed to do this, and the steamship must therefore be held in fault as well as the ferry-boat.

The damages will accordingly be apportioned, and a decree entered to that effect.