## Case No. 8,537.

### The LOUISIANA.

[2 Ben. 371; 1 Am. Law T. Rep. U. S. Cts. 72.] [1]

District Court, S. D. New York. April, 1868.

COLLISION OFF THE IRISH COAST — STEAMER AND SAILING VESSEL — DARKNESS — SPEED — VESSEL APPROACHED FROM BEHIND SHOULD SHOW A LIGHT — PORTING IN HASTE.

1. Where, on a dark night, a bark, close-hauled on her starboard tack, heading S. W. by W., having proper lights set, and making no change of her course, was struck on her port side by a steamer, which came from a direction abaft the bark's beam: *Held,* that, prima facie, the steamer was in fault, and the burden was on her of showing the contrary.

2. Where a steamer was running seven and a half knots an hour, heading W. by N. half N., having two men on the lookout, an officer on the bridge, and two men at the wheel, and a red light suddenly came in sight, bearing two points on the starboard bow, and the helm was at once put hard-a-port, and her engines were slowed, stopped, and backed, and the course of the steamer changed a point, but the officer, finding that a collision was inevitable, ordered the helm hard-a-starboard, with a view of lessening its effects, but before the order could be obeyed, a collision took place with a bark, the witnesses testifying that the bark could not be seen sooner, owing to the haziness of the night, and the bark's lights being hid from view by her screens, in the direction from which the steamer approached: *Held,* that it was sufficient, to show that the steamship was in fault, that she was running seven and a half knots an hour, on a coast where vessels were numerous, in weather so thick and hazy, that a red light, which came suddenly into view, was supposed by the officer in command to be half a mile off, but was, in fact, so near, that though her engines were immediately stopped and backed, the collision occurred.

[Cited in The Colorado, Case No. 3,028; The Hansa, Id. 6,037; The City of New York, 15 Fed. 629; The Alberta, 23 Fed. 812.]

3. A steamship, when approaching another vessel so as to involve risk of collision, must slacken her speed, or, if necessary, stop and reverse; but it is a fault in her to change her course, in ignorance of the true course and position of the other vessel.

[Cited in The Free State, Case No. 5,090; The Monticello, 15 Fed. 480.]

4. This steamship was in fault in porting her helm in ignorance of the course and position of the other vessel, and that fault contributed to the collision.

[Cited in The Western Metropolis, Case No. 17,439.]

5. The bark was also in fault, when she saw the steamship, as she did, approaching in such a direction that her regulation lights were not visible to the steamship, in not indicating her presence to the steamship by showing a visible light.

6. The damages must, therefore, be apportioned.

[This case had been previously heard upon motion of claimants for commission to examine certain witnesses in Liverpool. The motion, upon consent of libellants, was allowed, subject to right of cross-examination. Case No. 8,536.]

C. M. Da Costa, for libellants.

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission. 1 Am. Law T. Rep. U. S. Cts. 72, contains only a partial report.]

W. R. Beebe and C. Donohue, for claimants.

BLATCHFORD, District Judge. This is a libel for a collision, filed by Ferdinand L. Hansen and others, owners of the Prussian bark Auguste Louise, against the British steamship Louisiana. At the time of the collision the steamer was on a voyage from Queenstown, in Ireland, to New York, and the bark was bound from Queenstown to Tralee, on the west coast of Ireland. The collision occurred between nine and ten o'clock p. m., on the 5th of April, 1867, in the Atlantic Ocean, off the coast of Ireland, at a point about eight miles from Mizzenhead, a promontory on the southwest coast of Ireland. The bark was on her starboard tack, close-hauled, heading southwest by west, the wind being northwest by west. Her speed was about four knots an hour. She had her proper green and red regulation lights set and burning, the Prussian laws, on the subject of lights on vessels, being then and now the same as those of Great Britain and the United States. The steamer came from a direction abaft the beam of the bark on her port side, and the course of the bark was not at all changed down to the time of the collision. The steamer struck the bark nearly amidships, on her port side, and the bark soon sank, and was totally lost.

This statement of facts shows that the collision was, prima facie, the fault of the steamer, and the burden is thrown upon her of showing that she was not in fault. The case set up in the answer is, that the weather was thick and hazy, thickening and lighting up at intervals; that the steamer had two men on the lookout forward, one on each bow, an officer on the bridge, and two men at the wheel; that the course of the steamer was west by north half north; that, while running on this course, and at a speed of seven and a half knots an hour, a red light came suddenly in sight, at but a short, although uncertain, distance, bearing two points on the starboard bow, its distance being supposed by the officer in command to be about half a mile, but being, in fact, much less; that the officer at once gave an order to put the steamer's helm hard-a-port, which was done, and her engines were almost immediately slowed, stopped, and backed at full speed, and the course of the steamer was changed one point; that, finding that the collision could not be avoided, and with a view of neutralizing its violence and the directness of the blow, the officer ordered the steamer's helm to be put hard-a-starboard, but, before that order could be obeyed, the collision took place; that, when the light was first seen, it was determined to be that of a sailing vessel, but, her sails not being in view, it was impossible to determine the exact course she was on, and the only course that could properly be adopted by the steamer was to port, and slow, stop and back, which was done,

and the headway of the steamer almost, if not entirely, overcome; that, as the vessels approached each other very close, and at about the time they came in actual collision, it was discovered that the steamer was following the bark, coming up and angling toward her port quarter; that, when the lights of the steamer were first seen by those on board of the bark, at the distance of two miles, the lights of the steamer bore from the bark about six points abaft the beam, and bore, substantially, that position, up to about the time of the collision; that the lights of the bark were hidden from the steamer by the screens and sails, so that they could not be seen until too near to avoid the collision; that the collision was not caused by the fault or negligence of those on board of the steamer; and that, had those on board of the bark, when they saw a steamer approaching them on the port quarter, six points abaft the beam, given any indication of their whereabouts, as it was their duty to have done, the collision could easily have been avoided.

It needs no testimony, in addition to this answer, to establish the fault of the steamer. Here is a steamer, running at a speed of seven and a half knots an hour, in weather so thick and hazy, that a red light, on another vessel, which comes suddenly into view, is supposed by the officer in command to be about half a mile off, but is, in fact, much nearer, so near, that, although almost immediately the engines of the steamer are slowed, and stopped, and backed at full speed, a collision occurs, and the other vessel is run down by the steamer and sunk. This state of things alone is sufficient to show fault on the part of the steamer, causing the collision. Every steamship is bound, when in a fog, to go at a moderate speed, on peril of condemnation for damage caused by a collision, if she does not. The law on this subject, as deduced from settled decisions, was laid down by this court in the case of The D. S. Gregory [Case No. 4,099], in these words: "No positive rate can be prescribed. What would be a moderate rate of speed under one state of facts, would be an immoderate one under another. A steam vessel must, in a fog, reduce her rate of speed to a moderate rate or abide the consequences of an immoderate one, unless some special reason is shown for maintaining the rate of speed adopted." "In such a fog her speed ought to have been as much less than it was, as would have been sufficient to enable her to avoid the vessel at anchor. She ought not to have gone so fast as not to have been able, by slowing, stopping and backing, to avoid a collision; and, if the fog was so thick, that, at the speed she had, with all the precautions she used, she could not avoid the collision, the conclusion is irresistible, that her speed was not that moderate speed in a fog which is required by the well settled rules of navigation." In the case of The Great Eastern, 11 Law T. (N. S.) 5, in July, 1864, the judicial committee of the privy council lay down the law to be, that it is the duty of a steamer to proceed only at such a rate of speed as will enable her, after discovering a vessel meeting her, to stop and reverse her engines in sufficient time to prevent any collision taking place. In that case, every thing was done on board of the Great Eastern, after the other vessel was reported, that could be done, to avoid the collision, but without success. But the court held, that the speed of the Great Eastern was what rendered the contact inevitable, that she was to blame for such speed, and that it was her duty to proceed at no greater speed than, having regard to the state of the weather, made it possible to avoid the collision. The supreme court of the United States have held substantially the same view. In Newton v. Stebbins, 10 How. [51 U. S.] 606, it is said, that it may be a matter of convenience that steam vessels should proceed with great rapidity, but the law will not justify them in proceeding with such rapidity, if the property and lives of other persons are thereby endangered. In McCready v. Goldsmith, 18 How. [59 U. S.] 90, the court say, that no fixed and inflexible rule can be laid down as it respects the rate of speed of steam vessels navigating waters greatly frequented by vessels; that this must depend upon the circumstances attending each particular case; that these may justify a rate deemed prudent navigation at one time, that would be wholly unjustifiable at another; and that, in thick weather, and in a track where other water craft are usually to be met, a steam vessel must slacken her speed to such an extent as, with reference to the ability of discerning another vessel at the time, and the capacity of the steam vessel to control and stop her own forward movement, will enable her to avoid a collision. The same doctrine was held in Rogers v. The St. Charles, 19 How. [60 U. S.] 108, 111.

Now, the case set up by this steamer as a defence, in her answer, is, that the weather was so thick and heavy, that, although she had a sufficient lookout, and used every precaution, by slowing, stopping, and reversing her engines, when she discovered the light of the bark, to avoid a collision, she could not do so, because she was so close upon the bark. The defence is the fault. The rules of navigation are now so well settled, that there is no excuse for the habitual and persistent disregard of them which appears in almost every case of collision where a steamer is concerned. But, as was said by the supreme court in McCready v. Goldsmith, 18 How. [59 U. S.] 91, the only precautions which those in charge of a steam vessel seem to think they are bound to observe in navigation, are those which concern the safety of their own vessel. And even those precautions are too often disregarded, from a disposition to maintain unabated speed and take the risk of collisions.

In this case, the engineer in charge of the engines of the steamer testifies, that when he received a signal from the officer on deck, to stop the engines, he obeyed it immediately, by shutting off the steam; that the next signal, to back at full speed astern, followed immediately after the signal to stop, and was obeyed; that it took only a few seconds to put the engines at full speed astern, after the order; that about eight or nine revolutions astern had been made before the collision, the blow of which he felt; and that, with the speed of the steamer, and the sea and the weather such as they were at the time of the collision, it would, on a signal to stop and reverse at full speed, take about three minutes after the receipt of the signal to get sternway on the vessel. A speed of seven and a half miles an hour, is a mile in eight minutes, and three-eighths of a mile, or six hundred and sixty yards, in three minutes. The answer states, that when the light of the bark was seen, it was supposed by the officer in command to be half a mile off, but was, in fact, much less. That officer, Mills, in his testimony, says that he now thinks that, when he caught sight of the light, it was not more than one hundred and fifty or two hundred yards off, and that the speed of the steamer was seven and a half knots an hour. This steamer was, therefore, on the testimony of her own officers, running at a speed which required her to pass over a space of six hundred and sixty yards, or three-eighths of a mile, before she could, with every exertion, get sternway on from her full forward speed, in a night so thick and hazy that, with all proper lookouts, neither the hull nor the sails of a vessel could be seen at a greater distance than two hundred yards. She was doing this on a coast where vessels are numerous, and where the sudden coming up of fogs in intermittent banks is a frequent occurrence.

But there was another fault on the part of the steamer. The answer says, that, when the light of the bark was first made, it was determined to be that of a sailing vessel, but, her sails not being in view, it was impossible to determine her exact course, and that the helm of the steamer was at once put hard-a-port, and her course was changed one point. Mills says, in his testimony, that when he caught sight of the red light, he thought it was the light of a vessel crossing his bow from his starboard side to his port side— that is, the light of a vessel heading between southward and eastward, and not the light of one heading between southward and westward, and that, therefore, he ported; that if he had known at the time how the other vessel was heading, he would have starboarded instead of porting; that when he did find out how she was heading, he gave orders to starboard; that if, when he sighted the light, he had known which way the other vessel was heading, he would have cleared her; but that, when he did find out how she was

heading, he was too close to her for starboarding to be of avail. Miller, who was at the wheel of the steamer, says that he received the order to put the helm hard-a-port, and obeyed it, and changed the course of the steamer one point, and then received an order to starboard, and got the wheel only partly over to starboard, when the collision took place. The starboarding did not affect the course of the steamer, and the order to starboard was given by Mills, when, and as soon as, he discovered the way in which the bark was heading. Therefore, the porting and the change of the steamer's course one point thereby, all took place before those in charge of the steamer had any knowledge of, the true course of the bark, but after her light was sighted. A steamship, when approaching another vessel, so as to involve risk of collision, must slacken her speed, or, if necessary, stop and reverse, but it is a fault in her to change her course, in ignorance of the true course and position of the other vessel, if such fault contributes to a collision, even though she also stops and reverses. The steamer here did right in stopping and reversing, and appears to have done so promptly, but she did wrong in porting without knowing the course of the other vessel. The James Watt, 2 W. Rob. Adm. 270; The Northern Indiana [Case No. 10,320]. Mills testifies, that if he had starboarded, instead of porting, he would have cleared the bark. It was not a fault not to starboard, but it was a fault to port. Did the porting contribute to the collision? I think it plain, on the evidence, that it did. The order to starboard was given almost at the moment of collision. At the time of the collision, the change by porting had been one point. Therefore, if the order to port had not been given, the course of the steamer would have been, at the time of the collision, one point more to the westward, than it was, in fact. The witnesses on the bark say, that the course of the steamer in striking was a little from aft, and the answer sets up that the steamer approached from six points abaft the beam of the bark. Mills testifies, that starboarding, instead of porting, would have cleared the bark. The change of course, by starboarding, would have been to the same extent, during the same time, as by porting, that is, one point. Consequently, by starboarding instead of porting, the steamer would, at the time of collision, have headed two points more to the westward than she did in fact. Now, if one point change to the westward, by starboarding, would, according to the testimony of Mills, have avoided the collision, it is clearly to be inferred, that no change at all, by porting, would also have avoided it, especially in view of the claim on the part of the steamer, that she approached from six points abaft the beam.

The only fault alleged against the bark is, that she did not indicate her whereabouts to

the steamer, by some signal in addition to her red light. It is, I think, established, by the weight of evidence, that the red light of the bark came into the view of those on the steamer by its being opened to view suddenly as the steamer came up from aft, and not by its being made visible through the clearing away of haze or fog. This must be so, or else the testimony of those on board of the bark, that they saw the lights of the steamer for some time before she struck them, must be disbelieved. I am satisfied that the steamer's lights were seen from on board of the bark a considerable time before the red light of the bark was descried by the steamer. As soon as those on board of the bark perceived that there was real danger of collision, they blew a fog horn. But it is urged that they should have shown a light at the stern of the bark when they saw a steamer approaching from aft, from such a direction as to shut out from the steamer the view of the port light of the bark. I think this was the duty of the bark. The obligation upon the steamer, as a vessel overtaking the bark, to keep out of the way of the bark, did not relieve the bark herself from the obligation resting on her, on a night so dark as this was, from fog or haze, that the hull and sails of a vessel could not be seen at a greater distance than two hundred yards, and with a steamer, whose lights were seen for some considerable time, approaching from aft, in a line of direction very much the same as that in which the sails of the bark were braced, and from a quarter boding danger, as evinced by the use, on the bark, of her fog horn, and when the bark must have known that her port light could not be seen by the steamer, and that, so far as the steamer was concerned, it was as if the bark had no light, to adopt the precautions required by the ordinary practice of seamen and the special circumstances of the case. Under the present regulations, it is the duty of those who see any chance of an approaching collision, to take all reasonable means, consistent with the regulations, to avoid it, such means depending on the circumstances of the case. The Hannah Park v. The Lena (Nov. 1865) Holt, Rule Road, p. 61. A proper precaution in this case, as is shown by the evidence, would have been the exhibition of a flash light or a blue light. That this would have been effective is shown by the evidence that the steamer's lights were seen from the bark at a distance so great, that if the steamer had seen a light exhibited from the bark at the time it ought to have been exhibited, the steamer would have been able to entirely stop her headway before reaching the bark. There is nothing in this view that violates the requirements that a sailing vessel, under way, shall carry only the green and red lights, nor is there any thing in the objection that the exhibition or flashing of a white or blue light might have caused the bark to have been mistaken for a fishing vessel, or an open boat, at anchor or stationary. All the requirements in regard to lights, and fog signals, and steering and sailing rules, must have a sensible construction; and it is expressly provided by one article, that nothing in the rules shall exonerate any vessel from the consequences of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case. The neglect of the bark was a fault which contributed to the collision, and the bark must be held to the consequences of that neglect. Her fault, however, does not excuse the fault of the steamer. There is nothing in the rules of navigation that exonerates a vessel from the consequences of her violation of any of those rules, when such violation contributes to a collision. The violation of others of those rules, by the other colliding vessel, does not constitute such exoneration. As both vessels were in fault, there must be a decree apportioning equally the damages caused to the libellants by the collision.