## Case No. 284.

### The AMERICA.

[10 Blatchf. 155.][1]

Circuit Court, S. D. New York. Sept. 23, 1872.[2]

COLLISION—BETWEEN STEAMERS — PORTING HELM —LOOKOUT.

1. A collision occurred in the East river, between a steamboat from the Wallabout to the North river, and a ferry-boat crossing from New York to Brooklyn, on the Fulton ferry route: Held, on the facts, that the ferry-boat was solely in fault.

[See note at end of case.]

2. Although, at the time, the steamboat was in the sole charge of her pilot, and the assistant engineer, and her master and engineer, and the rest of the hands, were in the cabin, at supper, and such inattention was inexcusable, yet it did not contribute to the collision.

3. The two vessels approached each other so nearly end on, as to require each to keep to the right. The steamboat did so, and the ferryboat did not.

4. A vigilant lookout on ferry-boats crossing the East river is required.

[Cited in The Manhasset, 34 Fed. 419.]
[Approved in The Monticello, 15 Fed. 477.]

[Appeal from the district court of the United States for the southern district of New York.

[In admiralty. Libel by the Camden & Amboy Railroad Transportation Company, owner of the steam tug Fairfield, against the steam ferryboat America, owned by the Union Ferry Company. In the district court the libel was dismissed, with costs. The America, Case No. 281. Libelants appeal. Reversed. This decree was reversed by the supreme court on appeal. 92 U. S. 432. See note at end of case. For the decree of this court on the question of damages, see The America, Case No. 285.]

Charles Donohue, for libelants.
Benjamin D. Silliman, for claimants.

WOODRUFF, Circuit Judge. It cannot be denied that it was unsafe and improper, on the part of the captain, engineer and hands employed on the vessel of the libellants, the steamboat Fairfield, to leave her in sole charge of the pilot and assistant to the engineer, at the time they went to their supper. She had been at the Wallabout, on the southerly or Brooklyn side of the East river, had left her tow, and had come thence out into the river, and swung around, taking her course down the river, to go around the Battery, to her slip on the North river. It was about five o'clock in the evening, on the 13th of December, 1866. The sun had set, and it was nearly dark, though the shores and objects at a considerable distance were

[1][Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]
[2][Reversing The America, Case No. 281. Decree of circuit court reversed by supreme court in 92 U. S. 432.]

still visible. The Fairfield was about to pass through a channel crossed by numerous ferry-boats, and ordinarily travelled by other craft, rendering it especially important that more than ordinary watchfulness and competent skill in navigation should be in constant exercise. That, in these circumstances, no lookout should be stationed, and the captain should relinquish all attention to the navigation of the vessel, and, with all hands other than the two above named, go to the cabin for supper, was extraordinary, and, as I think, inexcusable. Nevertheless, if this inattention on their part in no wise contributed to the collision, if, in fact, the pilot saw all that was material, which he could have seen, or of which he could have been informed, had a proper lookout been stationed, and others had been on duty, then the question ceases to be affected by the want of a lookout, &c., and becomes simply a question of proper navigation, in view of what the pilot saw and knew of the presence and course of the ferry-boat with which the collision occurred. The ferry-boat, the America, came from her slip at the foot of Fulton street on the New York side, bound upwards and across the river to her Brooklyn slip. The tide was ebb and running very strongly down the river, and, in order to make her passage with facility, it was necessary for her to swing around to port, on a starboard helm, head up the river against the tide, go above her Brooklyn slip, and then port her helm, and swing into her slip. According to the testimony of the witnesses she made a course, by this means, well described by the letter S, in which she would travel, at first, across, and more than half across, the river, swinging upwards, and then inclining towards the New York side, preparatory to her last manoeuvre, of swinging into her Brooklyn slip. The pilot of the steamboat, the Fairfield, saw her from the moment she came out of the slip, and watched her movements continuously to the moment of collision. If he had had the assistance of one or many on the lookout, he could not have been sooner apprised of her approach, and he conducted the navigation of the Fairfield with all the information they could have given him, and with the ferry-boat in full view. The responsibility of this navigation was upon him. He controlled the movement of the Fairfield, while the man in charge of the engine promptly obeyed his instructions, and slowed, stopped and backed at his signal. I cannot, therefore, discover that the absence of the lookout contributed, in any degree, to deprive him of information, or that his management of the Fairfield was in any manner affected by the absence of the others, master or crew, at their supper, until the danger of collision was imminent.

The question on the part of the libellants is, therefore, whether the Fairfield was, in fact, skilfully and properly navigated, with the ferry-boat in full view, and, on the other hand, whether there was fault in the navigation of the ferry-boat. To determine this, it is important to ascertain the location of the two vessels at the time when it became the duty of one or both to take measures to insure safety. The testimony of the pilot of the Fairfield, corroborated by the testimony of the master and crew as to her course and location, both when they went to, and when they returned from, the cabin, is distinct and unqualified, that she was coming down nearly in the middle of the river. This is, also, her probable course, when her destination is considered, she being bound around the Battery to reach her slip. She, coming from the Wallabout, and taking her course down the river, would be under a temptation to incline towards the New York shore, and the witnesses on her part all state that such was her inclination. Some of them clearly exaggerate that inclination, but on the fact they are all agreed. This is denied by the witnesses from the ferry-boat. They say that the Fairfield was, when they saw her, on a course tending towards the Brooklyn shore, and some of them represent her as coming from the foot of Market street, on the New York side, obliquely, across the river, towards Brooklyn, near the very slip to which the ferry-boat was bound—in itself, not only in conflict with the witnesses from the Fairfield, but a most improbable story, and yet easily accounted for without imputing intentional misstatement to any one. In the first place, the witnesses on the Fairfield know, better than the others could know, her destination and her course. Next, in the obscurity of the evening twilight, observation from the ferry-boat is far less reliable than it would be if made in open day. Again, the witnesses from the ferry-boat did not see the Fairfield until the former had passed out into the river and swung around, so as to be headed up the river, still under a starboard helm, or at about the time her helm was steadied on her course upward. In the making of this movement, to all eyes on the ferry-boat the Fairfield would seem to be on a reverse course, and, especially at that time, and in so imperfect a light, the Fairfield would seem to be moving from them, in the opposite direction. Very great precision is rarely found in the statements of witnesses on either side, in cases of this description, and the imperfect light may have made the estimates of the witnessses from the Fairfield in some degree inaccurate, but their statements are not overcome by the observations from the ferry-boat, under circumstances so clearly adapted to deceive the observers, and when the admitted movements of the ferry-boat would easily produce the impression to which they testify, and yet be in perfect harmony with the fact, as stated by the libellants' witnesses. It is, also, true, that the testimony as to the distance of the place of collision from the Brooklyn shore is in conflict, and yet a small allowance, due

to the prejudice of the witnesses attached to either vessel, and, as to passengers, due to their observation, in which the motion of the ferry-boat was imputed to the Fairfield, leading them to the belief that the latter was moving in the direction of Brooklyn, removes this conflict from any great embarrassment. That the Fairfield was slowed, stopped and backed on the instant that the danger of collision rendered that proper, is very clearly proved. A main fact, which a just view of all the testimony seems to me to establish, furnishes to my mind the test of the responsibility for the collision; and this fact is not only supported by the witnesses for the libellants, as I have above stated, but is corroborated, not, perhaps, by the claimants' witnesses to their observation on the course of the Fairfield, but by their testimony to the course of their own boat. The fact is this. At the time when the two vessels gained such a position that precautions to pass each other in safety were proper, they were approaching each other so nearly end on, that the rule that each should keep to the right of the other applied to them.

Whatever be the rule respecting the duty of ferry-boats to keep a lookout from the forward deck, one thing is certain, that, in the navigation across this crowded channel, a most vigilant lookout from some place on the boat is required, and I can hardly conceive of any navigation in which, in view of the interests of life and property, and the dangers of inadvertence, it is more imperatively demanded. It is, also, clear, upon the proofs here, that the two men who are claimed to have acted as lookouts on the bow of the ferry-boat were wholly useless as such. They might as well have been in the cabin. They saw the Fairfield, it is true, before the collision, but made no report of her approach. Whether they even saw her before she was seen by the pilot, who was engaged in directing the boat out of her slip and into the river, and bringing her around to her course up the river, is, at least, doubtful, and, if they did, they gave no notice. It is, also, apparent, that the pilot himself did not see the Fairfield until he had accomplished all the manoeuvres last stated, and was near to the Fairfield, nor until she had obeyed the rule which, in the judgment of her pilot, required him to pass to the right, or port to port of the two vessels. The pilot of the ferry-boat was attentive to the endeavor to stem the strong ebb tide, and reach a point up the river at which he should make his final sheer into his slip, and he failed to discover the Fairfield, and learn her actual course and movement, so soon as it was the duty of either himself or some one who should inform him. He heard the one whistle of the Fairfield, but he was not at liberty to await that whistle, when the boats were approaching, as I think they were, so that each should keep to the right. This is easily accounted for. It was of importance to the ferry-boat that she should be kept up the river far enough, against the strong ebb tide, to enable her to swing readily around, so as not to strike below her slip. He was under a strong motive not to turn too soon to accomplish an entrance to his slip. Either because he did not see the Fairfield, and learn her true course, soon enough, or because he mistakenly persisted too long in keeping the ferry-boat up against the tide, he did not port his helm so soon as he ought. He did not do so till after the Fairfield had turned to the right, nor until, after that, she warned him, by her whistle, that she was acting in conformity with the rule which he also was bound to observe without such warning.

I cannot resist the conclusion, that the collision was due to the want of proper and seasonable observation on board the ferry-boat, to imperfect and mistaken observation when made in the dim twilight, to mistake, in imputing to the Fairfield an apparent motion due to the actual movement of the ferry-boat, to an over-anxiety to gain a distance up the river against the tide, to enable the ferry-boat easily to enter her slip, and, finally, to a neglect, from whatever cause, to turn to the right, as it was the duty of the ferry-boat to do, to avoid collision. These conclusions necessarily require that the libellants have a decree, to recover their damages and costs, and a reference to compute such damages must be ordered. 3 Ben. 424, [The America, Case No. 281.]

[NOTE. An appeal was taken to the supreme court, and the decree of the circuit court was there reversed. It was ordered that the damages resulting from the collision, and the costs of suit, be apportioned equally between the two vessels, on the ground that, if either had seasonably complied with the requirement as to the porting of her helm, the collision could not have occurred, and consequently both vessels were in fault. The America, 92 U. S. 432.]