## The Monticello, etc.

*(District Court, S. D. New York. March 6, 1883.)*

1. EAST-RIVER NAVIGATION—RULE 21.
   Steamers navigating the East river are bound to keep as near the middle of the river as may be, and under rule 21 must stop and reverse, if necessary, to avoid a collision. The steamer J. O. *held* liable in this case for disregarding both these obligations.

2. SAME—FERRY-BOAT—VIGILANCE REQUIRED.
   Ferry-boats, in crossing the East river, are bound to maintain a vigilant watch before leaving their slips to avoid danger from vessels which may be passing near. The ferry-boat M. *held* liable for a collision occurring about 140 feet outside of her slip, where she started without any lookout upon her bows, it being *held* that the steamer J. O., approaching within 50 feet of the wharf next above her, might have been seen by such lookout, or by the pilot, shortly after starting.

3. BOTH IN FAULT—DAMAGES DIVIDED.
   Where both vessels are guilty of independent faults contributing to the collision each is liable and the damages are divided.

In Admiralty.

*L. Ullo,* for libelant.

*B. D. Silliman,* for claimant.

BROWN, J. The libel in this case was filed to recover damages to the British steamer Jenny Otto from a collision with the ferry-boat Monticello a little outside of the Hamilton ferry slip, in the East river, on the Brooklyn side, on the sixteenth of January, 1879.

The Jenny Otto was an iron steamer 275 feet long, and about 941 tons measurement. She left her dock at Columbia stores, at the foot of Atlantic avenue, Brooklyn, at 2:40 P. M., about half an hour before high water. She was proceeding out to sea, intending to go by way of Buttermilk channel. About 300 feet out from the wharf at the Columbia stores there is a sand-spit or shoal in the East river, which extends to the south-westward, and which it is unsafe for vessels such as the Jenny Otto, drawing 20 feet, to attempt to pass. The shoal recedes from the Brooklyn shore to the southward, so that in the vi-

cinity of Hamilton ferry it is from 500 to 600 feet outside of the slip. About 140 feet above the upper pier of the ferry slip is a pier termed the shed pier, which extends about 40 feet further out into the stream than the piers above or below, and is covered by an elevator and a shed 22 feet high, extending to within 13 feet of its outer end.

The witnesses on the part of the Jenny Otto testify that upon leaving the Columbia stores she proceeded down the stream at least 250 feet off the end of the piers, as near as it was safe to go to the sandbar, at the rate of not over three knots; that she had got to the Union stores, about 300 feet above the Hamilton ferry slip, when, seeing a bark coming up the Buttermilk channel, her engines were stopped; that a few seconds afterwards the Monticello was seen coming out of the slip, when the steamer starboarded her helm so as to go astern of the ferry-boat, but struck her abaft the wheel, whereby two holes were stove in the steamer's port bow, which detained her six days for repairs.

On the part of the steamer it is claimed that she was in full view from the pilot-house of the ferry-boat before the latter left the slip; that the ferry-boat had no proper lookout; and that the collision was solely the result of her negligence.

On the part of the ferry-boat several witnesses testify that the steamer came close to the wharves and passed the shed pier not more than 25 or 50 feet distant therefrom; and the respondent contends that the collision is, therefore, due solely to the faulty navigation of the steamer in going so close to the shore, and also in giving no whistle signaling her approach. For the steamer it is alleged that whistles were sounded.

One piece of testimony, the correctness of which I see no reason to doubt, serves to fix pretty accurately the place of collision and its distance outside of the ferry slip nearly in accordance with the other testimony for the respondents; and this goes far to resolve the other doubts in the case arising from the usual conflict of testimony. The Baltic, companion boat of the Monticello, had crossed from the New York side, and was waiting about 100 feet outside of the lower end of the slip for the Monticello to come out. The pilot, in crossing, had observed the Jenny Otto coming down the stream, and says that as he lay waiting the Jenny Otto appeared to be designing to pass astern of his boat. As the Monticello came out, the Baltic proceeded ahead to enter the slip, and when about half way in the slip the force of the collision, the pilot says, carried the stern of the Monticello down the stream, so that she struck about 10 feet of the stern of

the Baltic. None of the three boats were stopped in their course, and the Jenny Otto passed down between the sterns of the two ferry-boats. The latter were each 174 feet long; and as the Baltic was half way inside of the lower slip when struck by the stern of the Monticello, it follows that the stern of the Monticello was about 77 feet outside of the end of the lower pier of the slip and her stem about 250 feet outside of it, and that the stem of the Jenny Otto, when she struck the steamer, could not have been more than 130 or 140 feet outside of the lower pier, and that, consequently, to reach this position she must have passed within about 50 feet of the end of the shed pier, as an inspection of the map will show.

From this determination of the place of collision and the course of the Jenny Otto within 50 feet of the end of the shed pier next above the ferry slip, she must necessarily be held in fault, because she had no right to be navigating in that part of the stream so close to the wharves. The state statute which requires steamers to proceed in the middle of the stream, the local rules, and repeated decisions of the courts, all unite in condemning navigation so near to the slips as dangerous and unjustifiable. The matter has been so repeatedly discussed, and the obligation of steamers to keep away from the ends of wharves and ferry-slips so forcibly stated, that it is wholly unnecessary to repeat it here. *The Ferry-boat Relief,* Olc. 104, 108–9; *The Favorita,* 18 Wall. 598, 601–2; 8 Blatchf. 539, 541; 1 Ben. 30, 39.

In this case there is no excuse or palliation for the Jenny Otto's proceeding so near the wharves. She drew less than 21 feet, the tide was high, and she could have proceeded with perfect safety at least 400 feet further out in the stream at that point. Had she been half that distance further out the collision would have been avoided. On this ground alone, therefore, she would be held chargeable with fault. She is also chargeable with fault because she did not "stop and reverse," under rule 21, § 4233, Rev. St., when it was clearly "necessary" to avoid the collision. Her pilot testified that he saw the ferry-boat coming from the time she left her slip; that his engines were already stopped; and that he did not reverse because he considered it unsafe to do so, from the peculiarities of the steamer's propeller. This excuse cannot possibly be accepted. There was plenty of room for the propeller to have reversed and checked her speed to some extent. She backed out of her position on starting from the Columbia stores in a channel-way of one-third the width, and her log shows her engines repeatedly reversed. A slight checking of her speed, sufficient to have allowed the ferry-boat five or six sec-

onds more time, would have avoided the collision. There was no difficulty in reversal at low speed; and for her fault in not doing so, as required by rule 21, the steamer is chargeable. If it were true that the propeller could not safely reverse at all, then her fault in proceeding along near the wharves becomes only the more gross; for, if under that disability, she should have taken the principal channel on the New York side of the sand-pit, as other vessels often do on leaving the same stores, and as she might have done, instead of proceeding down the narrower passage on the Brooklyn side.

As respects the Monticello, I think the proofs show conclusively that the approach of the Jenny Otto could have been seen from the bow of the Monticello before she started from her slip, and also by the pilot in the pilot-house, 36 feet back from the bows, in ample season to have avoided the collision, had any proper lookout or watch been maintained. The statute, the local rules, and the decisions of the courts, which require steamers to keep away from the wharfs and slips, are designed for the greater security of life and property only; they are not designed to relax in the slightest degree the obligation on the part of the ferry-boats to maintain all that care and watchfulness against danger which the lives in their keeping demand.

There are frequent cases where of necessity, in the busy traffic of this region, water-craft of various kinds are passing up and down in the immediate vicinity of the wharfs and slips, to which the general rule requiring them to keep off is not applicable. Moreover, it appears, from the testimony of the pilot of the Monticello, that vessels were in the habit of going from one to two hundred feet off from the shed pier; while the pilot of the Jenny Otto speaks of it as a constant practice to keep as near to the wharfs as possible, illegal and dangerous as that practice clearly is. The practical necessity, therefore, for constant vigilance against danger in leaving the slips is manifest; and a ferry-boat must be held in fault if she leaves her slip at the full speed of her engines, as in this case, when another vessel within view is crossing her path just outside of the slip.

In the case of *The America*, 10 Blatchf. 155, 159, the court say:

· "Whatever be the rule respecting the duty of ferry-boats to keep a lookout from the forward deck, one thing is certain, that in the navigation across this crowded channel a most vigilant lookout from some place on the boat is required; and I can hardly conceive of any navigation in which, in view of the interests of life and property and the dangers of inadvertence, it is more imperatively demanded."

This general duty is not denied by the learned counsel for the claimant; nor is it denied that one of the deck-hands, whose duty it was to act as lookout, was on the after part of the boat and did not reach the bows at the time of starting from the slip, nor, indeed, up to the time of the collision. But it is contended that the absence of this deck-hand from the bow as lookout in no way contributed to the collision, because the Jenny Otto could not have been seen if he had been there. The principle invoked is unquestionable, but I cannot hold it applicable upon the facts in this case. On the contrary, it seems to me very clear that the Jenny Otto could have been seen from the bow of the boat before she started.

From all the testimony, as well as from the necessities of the case, the place of collision being fixed, as I have above determined, the stem of the Jenny Otto must have been less than 300 feet from the place of collision when the Monticello started at the full speed of her engines. The latter was at full speed, as her pilot testifies, by the time she had moved 60 feet, or about one-quarter part of the way, out of the dock, and she had moved hardly more than 300 feet up to the time of the collision; most of the way, therefore, being at her full speed of seven to eight knots, while the speed of the Jenny Otto is not estimated by the pilot of the ferry-boat at over five knots, and her own witnesses place it at only two or three knots. The steamer, therefore, could not have moved more than about 200 or 250 feet between the time when the Monticello started and the collision; and this agrees well with the position of the steamer as given by several of the witnesses. This would bring the steamer's amidships about in front of the Union stores and her stem nearly down to the shed pier, as several witnesses also testify, so that her bows could not have failed to be observed by a lookout stationed on the bow of the Monticello and looking along a line either forward of or crossing the end of the shed pier, outside of the sheds, where the wharf was but four feet above water; and this is confirmed by the pilot of the Jenny Otto, who says he saw the ferry-boat when she started; nor could the pilot of the Monticello also, after moving outward a very little,—less than 50 feet,—have failed to observe the steamer if he had been on the lookout. His testimony on the subject of his own observation at the time of starting to leave the slip is so loose that it would seem designed to avoid any direct testimony on the subject. He was asked:

" *Question.* Was any object visible above you as you came out of the slip? *Answer.* The shed of the elevator pier was visible. *Q.* Well, sir, did you see any vessel? *A.* No, sir. *Q.* What did you first see, and how did it occur? Just describe what occurred. *A.* As we were going out of the slip I saw the covered shed above, and a ship was lying in along the pier, and when I came out I saw the Jenny Otto coming close in, and I could not back. I went right out, and she hit me on the starboard side."

On cross-examination he says:

" *Question.* Were you alone in the pilot-house on that day? *Answer.* Yes, sir. *Q.* Had you any other person besides yourself that would look out? *A.* The lookout had not time to get there; he was coming forward."

He testifies that he could not see over the top of the shed at high water; but I look in vain in his testimony for any statement or intimation that before starting he made any careful observation to see what vessels, if any, were coming, or that from the time of starting out of the slip he kept any definite watch for that purpose; while it is admitted that there was no other lookout on duty at that time. The distance from the bow to the pilot-house is put at 37 feet. He is asked:

" *Question.* Had you seen the Otto when you were there, 57 feet out of the slip, could you then have stopped and avoided a collision? *Answer.* No, sir."

This is undoubtedly true when they were 57 feet "out of the slip;" but if it were meant as a statement (which it is not) that he could not have stopped after having gone 57 feet from the start, it is manifestly untrue; for her bows were then not outside of the lower pier, and she plainly could have been stopped in the same further distance, or about the same as she had then made, which was less than one-third of the distance to the place of collision. It is impossible to excuse any remissness in the duty of keeping a vigilant watch against danger on the part of ferry-boats laden with precious lives. I am satisfied in this case that there was such remissness in not observing the steamer as she might and ought to have been observed in season to avoid the collision.

The faults of the Monticello do not excuse the steamer for her own independent faults, nor serve to charge the former alone for the damages, as contended by the counsel for the libelant. It was no more the duty of the ferry-boat to be watchful before starting and in coming out of the slip, so as not to run into visible danger ahead, than it was the duty of the steamer to keep further out in the stream, and to reverse her engines when a collision was seen to be probable. And so,

though the Jenny Otto was navigating close to the wharf where she had no right to be, that did not authorize the Monticello to run into her, nor to leave her slip without the exercise of that vigilance and nautical skill in avoiding danger which the law imposes upon ferry-boats as much as upon other vessels in order to secure the safety of life and property. *The Continental*, 14 Wall 345, 359; *The Louisiana*, 2 Ben. 371, 380; *The Vim*, 12 FED. REP. 906, 913, and cases there cited. Had either performed its own legal duty, the collision would have been avoided. Each is, therefore, chargeable with contributory negligence, and the damages in such cases in admiralty are divided.

An order of reference is directed to compute the damages, with costs.