### THE CHICAGO.[1]

### THE ALVENA.

### ATLAS S. S. CO. v. THE CHICAGO et al.

### PENNSYLVANIA R. CO. v. THE ALVENA.

(District Court, S. D. New York. January 27, 1896.)

COLLISION—FERRYBOAT—TUG AND TOW NEAR THE SLIPS, OBSTRUCTING EGRESS—CONFLICTING TESTIMONY—TUGS LIABLE—TOW DISCHARGED.

As the ferryboat C. was leaving her New York slip near a long covered pier which obstructed the view above, the tug G. having the S. S. Alvena, 275 feet long, in tow astern upon a hawser 175 feet long, suddenly appeared near the mouth of the slip. On very conflicting testimony as to the distance of the collision from the end of the pier: *Held* (1) that the circumstances and the superior position for observation of the witnesses for the ferryboat outweighed the greater number of witnesses opposed, and that the collision was not over 200 feet from the end of the pier: (2) that the tugs were in fault for navigating with an unwieldy tow so near the slip without excuse: (3) that the ferryboat was proceeding along the covered pier at moderate speed, and having reversed as soon as she was aware of the presence of the tow behind the tug was without fault: (4) that the Alvena, though the instrument of the wrong, and though the navigation was for her benefit, yet *being in charge* of the tugs, was not, under the decisions, to be charged with blame; sed quere?

In Admiralty. Collision.

Wheeler & Cortis, for the Alvena.

Robinson, Biddle & Ward, for the Chicago.

Wing, Putnam & Burlingham, for the Wendell Goodwin and the Richard J. Barrett.

BROWN, District Judge. About half past 7 o'clock in the morning of October 28, 1895, the steam ferryboat Chicago, just as she got out of her slip at the foot of Cortlandt street on a trip to Jersey City, came in collision with the steamship Alvena, coming down a short distance outside of the piers in tow of the tugs Goodwin and Barrett. The latter was on the steamer's starboard side, and the tug Goodwin was ahead, towing upon a hawser about 175 feet long. The bow of the ferryboat, very near the center, came

[1] Affirmed in circuit court of appeals. See 78 Fed. 924.

in collision with the stem of the steamer, doing damage to both, for which the above libels were filed. The steamer was 275 feet long. She was not under her own steam. Her navigation was in charge of the pilot of the Barrett, who was on the bridge of the steamer along with the captain.

The ferryboat gave a long whistle on leaving the bridge. About the time that whistle stopped, the Goodwin gave her one whistle, having seen the Chicago only a moment or two before. The Goodwin was then seen from the ferryboat, but not the hawser, or the Alvena, as they were obscured by the shed. On seeing the hawser a few moments later, the ferryboat reversed full speed, and got three revolutions astern at collision. The contention of the ferryboat is that the collision took place within 50 or 100 feet of the end of pier 13, called Starin's pier, which forms the upper side of the ferryboat slip. This pier is about 750 feet long by 100 feet wide, and is covered by a shed up to within about 22 feet of the outer end, which obstructs the view of boats above. The other witnesses contend that the collision was from 250 to 500 feet from the end of the pier.

If the place of collision was as near the end of Starin's pier as the ferryboat's witnesses testify, I should have no doubt that the time was insufficient for the ferryboat to avoid the collision after the tow was discoverable. The testimony as respects the distance of the collision from the end of the pier is, however, very conflicting. The greater number of witnesses are opposed to the ferryboat. But the estimates of distances are not very trustworthy. Besides the differences in the estimates themselves, there is such frequent lack of consistency in the testimony of several of the witnesses as greatly to diminish confidence in these estimates. Four witnesses on the part of the steamer and the tugs, testify that at the time of collision they could see clear water between the stern of the ferryboat and Starin's pier; and they estimate the breadth of clear water seen at from 50 to 100 feet. The ferryboat was headed at the time of collision from 2 to 4 points up river; so that if any considerable space of clear water was visible between that pier and the stern of the ferryboat at the time of collision, her bow must have been at least 200 feet outside of the pier, since the ferryboat herself is 200 feet long. I cannot give credit to the testimony of the Goodwin's captain on that point, as he could not have been in a position to see any such clear space, if there was any, if his other testimony as to his position is correct; and as respects the other witnesses below the place of collision, I am not at all sure that the space of clear water they say they saw was not between the stern and one of the shorter piers below Starin's pier.

In the very unsatisfactory state of the direct testimony as respects the distance from the piers, I am inclined to place more reliance upon what may be deduced from the testimony of the principal witnesses as to their positions, and the bearings of the vessels a little before the collision, especially as the principal witnesses are in accord on that point. The captain of the Goodwin states that when he blew a blast of one whistle to the ferryboat,

he was abreast of the upper line of Starin's pier, and saw the ferry-boat in the slip over the lower corner of Starin's pier, i. e. outside of the shed. He could not see the steamer over the shed. He also stated, in answer to a question by the court, that the ferry-boat's bow at that time was about 100 feet inside of the outer end of Starin's pier, and heading straight for his boat, i. e. about 3 points up river. This agrees with the statement of the captain of the ferryboat that when he first saw the tug's hawser and rang to stop and reverse (which he says was 3 or 4 seconds after the Goodwin's whistle), he saw her across the lower end of Starin's pier, a little on his starboard bow—the steamboat being at that time headed about 2 points up, and her bow about 100 feet inside the end of the pier. Other witnesses place the Alvena in accord with this distance up river.

On placing models upon a diagram of that part of the shore line drawn to scale in accordance with this testimony, it becomes evident that if the Goodwin was as much as 300 feet outside of Starin's pier, the ferryboat, in order to be seen across the lower corner of Starin's pier, would have to be placed in a position which it is impossible she could have occupied at that time. Coming out from the lower bridge, as she did, any reasonably possible position for her would not permit the Goodwin, when abreast of the upper line of Starin's pier, to be placed at the utmost more than 200 feet outside of that pier; and a distance of 150 feet or less would be much more probable, if not almost certain; and if the place of collision was also 50 feet below the lower side of Starin's pier, as some of the tug's witnesses say, the course of the tugs must have been much nearer than 150 feet from Starin's pier, in order to keep good the range on which both agree.

The witnesses Kenny and O'Neil, who were standing at the end of a float 50 feet wide, moored on the southerly side of Starin's pier, about 150 feet inside of the outer end, were in the best position of any of the disinterested witnesses to observe the exact place of the collision, and the position of the ferryboat. They could not see over the shed at all, and the Alvena would not come within range of their vision until her bow had got near the lower corner of Starin's pier. They both testify that they saw the collision, and that it was a trifle below the lower side of Starin's pier. O'Neil says it was 15 or 20 feet below; and that the ferryboat passed within about 25 feet of the corner of his float as she went out, and was headed up stream 2 or 3 points; and that the stern of the ferryboat, at the time of the collision, was inside of the pier. These witnesses had not noticed the boats until a few moments before. They were not subject to any such excitement as would hinder correct observation; and the very limited range of their vision makes it improbable that there could be much confusion in their recollection, or much liability to error. As this testimony accords with the positions required by the range before referred to, I must find that the place of collision was less than 200 feet from Starin's pier, probably not over 175 feet, if so much.

This finding further agrees with the testimony of many of the

witnesses to the very short interval between the time when the Goodwin gave her whistle and the collision. With an ebb current of one or two knots, such as there must have been along the docks three hours and a half after high water, I have no doubt from the testimony that the Goodwin and Alvena were going down at the rate of upwards of 5 knots. As she traversed only about 350 feet from the time of her whistle to the collision, the interval of time would be less than three-fourths of a minute. The ferryboat had slowed soon after starting, and could not have acquired her full speed; and she reversed when the tug's hawser came in sight a few seconds after the whistle, when her bow was about 75 or 100 feet inside of the end of Starin's pier. During this interval, with the engines reversed, it is not probable that she could have moved over 250 feet.

Upon this conclusion as to the place of collision, I think the necessary result is that the Chicago must be freed from blame, and the fault be charged upon the tugs for coming down river so near to the wharves and obstructing egress from the ferry slip. Even if the collision had been 300 feet from the end of the pier, I do not see how the tugs could have been exempted from blame. The suggestion that they gradually worked in shore to go astern first of another tow, and then of a sail lighter, is not a sufficient excuse. There is no evidence that they could not have gone farther out in the river; and the evidence shows that no serious attempt was made to regain their previous position farther from shore. A steamer like the Alvena, 275 feet long, without steam of her own, is an unwieldy tow, and there is no justification for bringing such a tow so near the slips, except some actual necessity, and that is not shown in this case.

The clear primary fault being upon the tugs, the Chicago cannot be held in fault, unless it clearly appears that she had notice of the tow, and of its dangerous character, in time to avoid collision, or that she ought by a good lookout to have seen it; and that she failed either in the observance of some specific rule, or in the exercise of reasonable prudence to avoid collision. The burden of proof in this regard, in a situation like the present, falls upon the tugs. They have not sustained that burden. The testimony of the witnesses upon the ferryboat in respect to the reversal of her engines, must be accepted, rather than the testimony of persons at a distance, as to what they think they saw in regard to the movement of her paddle wheels. The testimony of her own witnesses is also confirmed by disinterested persons in that regard. I see no reason to discredit the officers of the ferryboat as to the management of their boat from the time she left the bridge.

In the case of The Monticello, 15 Fed. 474, the ferryboat was held in fault on the finding that the boats outside the slip could have been seen from the time the former left the landing. That is not so here. The shed on the pier above obstructed the view above until the time when the Goodwin whistled and then the ferryboat's bow was nearly out of the slip. When the Goodwin first came in view, moreover, neither the hawser nor the tow could

be seen. There was no danger to the Goodwin, and the ferryboat at that moment had no apparent reason for stopping; and when a little afterwards the hawser first hove in sight, which was the first notice that the Goodwin had a tow, the ferryboat's officers testify that they reversed full speed. I do not see sufficient reason to discredit that testimony. In the interval that remained before collision, three revolutions astern, to which the engineer testifies, are quite as many, considering the slower movement astern at first, as would naturally be expected. They were not sufficient to stop the way of the ferryboat before the collision. It does not appear that there was any delay in reversing after the presence of the tow was visible. There was nothing else the ferryboat could do to avoid collision. Starboarding would naturally have produced a more destructive collision, by bringing the Alvena's stem into the starboard side of the ferryboat, with greater danger to the lives of her passengers.

If the evidence warranted the finding that the ferryboat, when within 100 feet of the end of Starin's pier, was going at her full speed of 12 knots, or at nearly that rate, I should have no hesitation in finding her partly to blame for this collision. Such a rate of speed in passing along a covered pier which obstructs the view of other vessels above, must be held to be most imprudent if not reckless navigation, not merely with reference to the frequent practice for vessels to come down unjustifiably near the piers, but also with reference to other vessels that, in pursuit of their legitimate right of entrance to the slips, might be approaching unseen near the piers above. And if the ferryboat was going at nearly full speed when the Goodwin, or her hawser, was first visible, the fact that she had reduced her speed to a comparatively small rate at the time of collision, which the nature of the injuries to the two boats shows to be the case, would be conclusive evidence that had she been going at the moderate speed, say of six or seven knots, as was manifestly her duty when coming along such a covered pier, she would have been wholly stopped before reaching the line of the Alvena's course, and the collision thereby avoided. But the evidence of her officers, is to the effect that after starting from the bridge under a jingle bell, she soon slowed, and proceeded under one bell only. This would give her but a moderate and justifiable speed in going out of the slip. There is not sufficient evidence, as I have said above, to discredit the officer's testimony in this regard; and the circumstances are in harmony with this testimony.

It does not appear that the captain, who was on the bridge of the Alvena, took any part in the responsibility for her navigation. Though the navigation was procured by the Alvena, and was for her benefit, and was with the acquiescence of the master, and though the damage was done by her, yet, under the existing decisions of the appellate courts in this country, as I understand them, I am not at liberty to hold the Alvena responsible, however much this result may seem to me to be impolitic and unjust, and neither in accord with the generally accepted principles of the maritime law elsewhere, nor harmonious with our own decisions as respects

the liability of chartered steamers. The Doris Eckhoff, 32 Fed. 558, 560, 50 Fed. 135, and cases there cited; The Express, 46 Fed. 860, 863; Id., 3 C. C. A. 342, 52 Fed. 890.

Decrees dismissing the libel as against the Chicago and the Alvena, with costs; and decrees for the libellants against the tugs, with costs.